# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

MATT BANKS #116002             CIVIL ACTION NO. 3:14-cv-2554

                                         SECTION P

VS.

                                         JUDGE ROBERT G. JAMES

WARDEN BURL CAIN             MAGISTRATE JUDGE HAYES

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Matt Banks, a prisoner in the custody of Louisiana's Department of
Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on
August 21, 2014.  [doc. # 1].  Petitioner attacks his two second degree murder convictions and
the two life sentences imposed by the Fourth Judicial District Court, Ouachita Parish.  This
matter has been referred to the undersigned for review, report, and recommendation in
accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court.

### Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit
Court of Appeal as follows:

> Shortly after 11:00 p.m. on June 29, 2002, firefighters found the bodies of Irma
> Williams and her brother, Roy Tugler, inside their burning home at 1606 Hwy. 139
> in Monroe, Louisiana. Each body revealed blunt force trauma. The body of Williams
> was partially burned and smelled of accelerant.

> Williams and Banks were involved in a violent relationship for over a decade. They
> had recently broken up, and she was dating another man.

> Authorities interviewed Banks on the day after the murders. His truck and home were
> searched and items removed for analysis. Also occurring on the day after this horrific
> event was the discovery of an iron plumbing pipe at the crime scene. Banks is a
> plumber. Human hairs were embedded in one end of the pipe along with what was
> believed to be blood. None of the physical evidence linked Banks to the crime scene.

> The case lay dormant for seven years.
>
> In 2009, a former deputy revealed that a neighbor of Banks's might have relevant information. The neighbor stated that on the night of the murders, he heard Banks talking loudly with Williams and then later saw Banks walking away from the neighborhood. After further investigation, Banks was arrested and indicted for two counts of second degree murder. He was convicted as charged.

*State v. Banks*, 86 So. 3d 56, 57 (La. App. 2 Cir. 2012).

The trial court ordered Petitioner to serve two consecutive life imprisonment sentences at hard labor without benefit of probation, parole, or suspension of sentence.  [doc. # 9-3, p. 22-25]. The Second Circuit Court of Appeal affirmed Petitioner's convictions and sentences on January 25, 2012.  *Banks*, 86 So. 3d at 66.  The Louisiana Supreme Court denied Petitioner's subsequent application for writ of certiorari on May 25, 2012.  *State v. Banks*, 90 So. 3d 410 (La. 2012).

On December 18, 2012, Petitioner filed a *pro se* application for post-conviction relief in the trial court.  [doc. # 1-2, p. 31].  There, Petitioner claimed that his counsel was ineffective for several reasons: (1) failure to investigate and interview witnesses; (2) failure to inform petitioner of plea deals; (3) failure to object to gruesome photographs; (4) failure to object to prosecutorial misconduct; (5) failure to object to a jury instruction; and (6) failure to seek independent scientific testing of the evidence.  *Id.*  The district court denied the application on May 14, 2013.  [doc. # 1-3, p. 34].  The Second Circuit Court of Appeal denied Petitioner's application on August 22, 2013.  *Id.* at 54.  The Louisiana Supreme Court, on May 2, 2014, likewise denied Petitioner's application.  *Id.* at 257.

Petitioner filed the instant Petition on August 21, 2014.  [doc. # 1].  He raises two assignments of error: ineffective assistance of counsel and insufficient evidence.  *Id.*

The matter is now before the Court.

<u>**Law and Analysis**</u>

**I.      Standard of Review – 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254,

governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims.

After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is

limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398

(2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting

*Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as

opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-

court decision."  *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court

may grant the writ only if the state court "identifies the correct governing legal principle from . . .

[the Supreme Court's] decisions but unreasonably applies the principle to the facts of the

prisoner's case."  *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## II.    Petitioner's Claims

A. Claim One: Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective for failing to investigate and interview a crucial witness, failing to inform him of the State's plea offers, failing to obtain an expert, and failing to object to the introduction of prejudicial photographs.  [doc. # 1-1, p. 13].

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him.  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered.  *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs of the test also need not be analyzed in any particular order.  *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997).  Further, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."  *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

When applying the first prong of *Strickland*, federal courts do not second-guess the attorney's decision from the distorting perspective of hindsight; rather, they presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy.  *See Strickland*, 466 U.S. at 689-90.  The burden, therefore, is on the petitioner to show that counsel's representation was objectively unreasonable.  *Id.* at 688.

To establish prejudice, the second prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "That requires a substantial, not just conceivable, likelihood of a different result."  *Cullen*, 131 S. Ct. at 1403 (internal quotation marks and citation omitted).  Stated differently, a petitioner must demonstrate that counsel's actions "were so serious as to render the proceedings unreliable and fundamentally unfair."  *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984).  Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Finally, when review is governed by the AEDPA, review of the state court's resolution of the ineffective assistance of counsel claim is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009), since the question is "whether the state court's application of the *Strickland* standard was unreasonable."  *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).  Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Id.*  Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.* at 786.  To obtain relief, a petitioner must show that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-

87.  "The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.* at 788.

i. Failure to Investigate

Petitioner claims that counsel rendered ineffective assistance when he failed to investigate and discover a crucial witness, Ruthie Williams.  [doc. # 1-1, p. 15].  He claims that Williams, the victims' aunt, would have provided exonerating testimony, and he attempts to substantiate his claim by attaching an alleged exculpatory letter that Williams purportedly sent to his trial counsel *after* he was convicted.  *Id.*  The letter, dated April 20, 2011,[1] reads as follows:

> I, Ruthie Mae Williams knows that Matt Banks did not kill Irma Williams and her brother Jr. Tucker.[2]  I have been trying to get in touch with Matt Banks lawyer.  I also told the D.A. what I knew the D.A. told me thank you, you don't have to come to court.  I, Ruthie Mae Williams am willing to come to court and tell what I know about the murder of my niece and newphew.  If you need any more information please call me at . . . .

[doc. # 1-3, p. 72].  The letter is not notarized or otherwise authenticated.  *Id.*

"[A]n attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case."  *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (citing *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985)).  "[C]ounsel's investigation does not have to uncover every conceivable fact to be reasonable."  *Williams v. Stephens*, 575 Fed. App'x 380, 385 (5th Cir. 2014) (citation omitted).  When assessing the reasonableness of an attorney's

---

[1] Petitioner was convicted on February 15, 2011.  [doc. # 9-2, p. 68].

[2] Presumably, the author of the letter was referring to Ruthie Williams' nephew, Roy Tugler.  Given that Ruthie Williams likely knew that her nephew's last name was Tugler, not Tucker, the Court questions the authenticity of the letter.

investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).  A petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial.  *Miller*, 420 F.3d at 361.

Here, Detectives Knight and Harper with the Ouachita Parish Sheriff's Office interviewed Ruthie Williams on July 1, 2002:

Q. Okay. You were [the victims'] aunt?

A. Aunt.

Q. And you lived in the trailer next to them, is that correct?

A. Yes sir.

\* \* \*

Q. Uh, Saturday.  Now, when this happened, the murders.  Did you, did you see Matt at all that day?

A. I'm gonna be honest with you, I did not see Matt.  All I had seen Matt ca', uh, truck parked at the uh, close to his, I do not see him now.

Q. His white truck?

A. Yes, that's all I seen.  His truck was parked right there in front of his uh, porch.

Q. All right.

Q. Okay.

Q. What time would you say you saw his truck?

A. It's hard to say. It really is. It's hard to say.

Q. Was it still light or dark?

7

A. Well, it was daylight but it was bright day, you know

A. Uh huh

Q. Like it is now. But who, I, I can't tell you exactly what time. (Inaudible) bout one o'clock or something nother like that.

* * *

Q. Did uh, what, what, were you at home all day Saturday?

A. Yes sir.

Q. Did, you didn't go anywhere?

A. No sir. I was, I was (inaudible) in the bed.

Q. Right.

A. I ain't go nowhere Saturday.

Q. All right.

A. No sir, I didn't.
Q. How many times did you look out to and you saw Matt's truck?

A. Well really I looked out this one time cause see I wasn't paying any no tention over there.

A. Right.

A. All I done, peepin' out the door. (laughing) I ain't (inaudible)

Q. And you don't remember what time it was?

A. Yeah, I been about one o'clock or something (inaudible) it's up in the bright day, you know.

Q. Yeah.

A. And all I was doin' jus' lookin' out the door. That's all.

Q. What about later on in the evening?

8

A. Nope.

Q. (Inaudible) Did you not see it, or did you not look?

A. I didn't look. I didn't nar' open the door. I went out through my backdoor to turn my light on.

Q. Right

A. Look. I did not look, I can't. I can't say that.

Q. Okay

A. And there again I wan't payin' it no 'tention now. God knows I (inaudible). All I was trying to do, get up an, to get out there and plug my light up.

* * *

Q. Do you know who, who would have had troubles with Irma and J.R.? I mean, who would of, could of done this? Have you heard anything?

A. No.

Q. You hadn't heard anything that would help us out?

A. I ain't heard nothin'. (Inaudible both talking)

Q. Would they, did they have some problems with anybody that you know of?

A. Mmm. Ain't nobody know how she have no problem. I couldn't, I couldn't say.
[doc. #s 9-15, p. 69; 9-16, p. 36-39].

The trial court, on collateral review, denied Petitioner's claim and reasoned as follows:

As noted above, law enforcement officers had interviewed Ms. Williams, who claimed to have no knowledge of who might have killed the victims. At no point did she provide exculpatory evidence or statements to the State or to investigators. Defense counsel's decision not to interview a witness the State found to be erratic and unreliable and instead utilize his time in other ways was a reasonable trial strategy.

[doc. # 1-3, p. 32].

9

Here, Petitioner fails to demonstrate that the trial court's ruling was unreasonable. Williams' statements to the detectives clearly contradict the statement she allegedly made in the 2011 letter.  In the letter, Williams allegedly stated that she knew Petitioner did not kill the victims.  However, in 2002, shortly after the crimes occurred, Williams stated that she never saw Petitioner on the day of the murders, that she stayed in her home the entire day, that she only looked out of her window once, and that she did not pay any attention to the home next door (where the murders occurred).  Above all, she told Detective Knight that she had no information about the murders and that she did not know who the perpetrator was.

Considering the foregoing, Petitioner fails to demonstrate that counsel rendered deficient performance.  *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) ("This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face . . . ." (citation omitted)).  Moreover, even if counsel had interviewed Williams, the trial's outcome would not have differed because Williams would not have provided any exculpatory information that would have led counsel to either investigate further or call Williams as a witness.  The state court's ruling was not an unreasonable application of clearly established federal law as determined by the United States Supreme Court in *Strickland*.

ii. <u>Failure to Inform Petitioner of a Plea Offer</u>

Petitioner claims that counsel rendered ineffective assistance when counsel failed to relay the State's plea offers to him.  [doc. # 1-1, p. 23].  Initially, the State informed counsel that it was willing to allow Petitioner to "plea to 2 counts of manslaughter with a 15 year cap."  [doc. # 9-15, p. 56].  Months later, the State informed counsel that the original plea offer would expire when the victims' bodies were exhumed.  *Id.* at 57.

The state *habeas* court denied Petitioner's claim because it found no reason to believe that "he would have agreed to plead guilty, even to a reduced charge."  [doc. # 1-3, p. 32].  The court reasoned that Petitioner asserted his innocence throughout the proceedings.  [doc. # 1-3, p. 32].

Petitioner contends that the state court's ruling is unreasonable because he always "had the right to proclaim his innocence."  [doc. # 15, p. 15].  He argues that his protestations of innocence do not definitively indicate that he would not have accepted the plea offers.  *Id.*  He continues to maintain his innocence in the instant proceeding, but he nevertheless claims that he would have accepted the State's deal because the State had "enough circumstantial evidence to support [its] case against [him]."  [doc. # 1-1, p. 31].

"[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012).  To prove ineffective assistance, however, a petitioner must not only show that counsel failed to disclose a plea offer, he must also demonstrate that "there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012).

Here, the record does not indicate whether counsel communicated the plea offers to Petitioner.  *Cf. Frye*, 132 S. Ct. at 1410 ("On this record, it is evident that Frye's attorney did not

make a meaningful attempt to inform the defendant of a written plea offer before the offer expired."); *Arnold v. Thaler*, 484 Fed. App'x 978, 981-82 (5th Cir. 2012) (noting that the State did not dispute that the petitioner's attorney failed to relay the plea offer). However, even assuming counsel did fail to convey the offers, it is reasonable to conclude that counsel's failure did not prejudice Petitioner because Petitioner would have rejected any deal presented to him.

The Court recognizes the inherent difficulty of predicting whether Petitioner would have accepted the State's plea offer. Nonetheless, the Court need not definitively make that prediction because the question is not whether counsel's alleged failure prejudiced Petitioner, but whether the state court's adjudication of Petitioner's claim was unreasonable. Considering Petitioner's resolute proclamations of innocence at sentencing,[3] throughout the state court proceedings, and in the instant proceeding, the trial court's decision to reject Petitioner's claim on the basis that he did not suffer any prejudice was not unreasonable.

### iii. Failure to Obtain an Expert

Petitioner claims that counsel rendered ineffective assistance by failing to secure an expert "to refute the State's experts' findings." [doc. # 1-1, p. 32]. Claims of uncalled witnesses are not favored in federal *habeas corpus* review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of the content of a prospective witness's testimony are largely speculative. *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (citing *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)). To demonstrate ineffective assistance, a petitioner must name the witness, demonstrate that the witness was available to

---

[3] At sentencing, the trial judge remarked that Petitioner "seems to believe he is somehow the victim." [doc. # 9-3, p. 22].

12

testify and would have testified, set out the content of the proposed testimony,[4] and show that the

testimony would have been favorable to a particular defense.  *See Alexander v. McCotter*, 775

F.2d 595, 602 (5th Cir. 1985); *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981).

Here, Petitioner fails to identify a particular expert that counsel should have discovered or

called.  By extension, Petitioner fails to show that an expert would have actually testified in his

favor.  The state court's rejection of this claim was not unreasonable.

iv.  Failure to Object to Inflammatory Photographs

Petitioner claims that counsel failed to object when the prosecution introduced gruesome

photos of the victims' burned bodies.  [doc. # 1-1, p. 35].  He argues that the photographs were

inadmissible because their "probative value did not outweigh the[ir] prejudicial effect" on the

jury.  *Id.*  The trial court, on collateral review, denied Petitioner's claim because it found that the

probative value of the photographs was not substantially outweighed by the photographs'

prejudicial effect.  [doc. # 1-3, p. 33].

In Louisiana, "Photographs of the victim at the murder scene are generally admissible to

prove corpus delicti, corroborate other evidence and to establish cause of death, identity, or the

number, location and severity of wounds."  *State v. Davis*, 637 So. 2d 1012, 1026 (La. 1994).  "It

is well established that the test of admissibility of allegedly gruesome photographs is whether

their probative value outweighs the possible prejudice that may result from their display to the

---

[4] "[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, a habeas court cannot even begin to apply *Strickland's* standards because it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance." *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

jury." *State v. George*, 346 So. 2d 694, 702-03 (La. 1977).[5]   More specifically, "Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence."  *State v. Magee*, 103 So. 3d 285, 323 (La. 2012).

Here, the State introduced ten photographs depicting the victims' bodies.  [doc. # 9-1, p. 9-10].  Petitioner does not cite to any particular photograph or otherwise indicate which of the ten photographs he is referring to, and he provides only a cursory explanation as to why the unidentified photographs were prejudicial.  Given Petitioner's failure to identify the specific photographs at issue, as well as his perfunctory argument, there is no basis for concluding that counsel's decision not to object to the unidentified photographs constituted deficient performance,[6] or that the photographs overwhelmed the jurors' reason and led them to convict without other sufficient evidence.  The state court's determination was not unreasonable.

Ultimately, Petitioner fails to overcome the deference owed to the state *habeas* court in that he fails to show that the court's denial of the aforementioned ineffective assistance of counsel claims constituted an error beyond any possibility for fairminded disagreement. Petitioner's claims should be **DENIED**.

---

[5] To be precise, LA. CODE EVID. art. 403 states that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

[6] This is especially true considering that an attorney's choice of whether or not to make certain objections falls within the ambit of trial strategy and should not be second-guessed. *Thomas v. Thaler*, 520 Fed. App'x 276, 281 (5th Cir. 2013) (citing cases).

B. Claim Two: Insufficient Evidence

Petitioner claims that the evidence presented at trial was insufficient to find him guilty of the charged crimes.  [doc. # 1-1, p. 35].  He argues that the State did not exclude every reasonable hypothesis of innocence because it did not exclude the possibility that someone else murdered the victims.  *Id.* at 39.

When a *habeas* petitioner asserts that the evidence presented was insufficient to support his conviction, the limited question before a federal *habeas* court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002).  A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence."  *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Here, the Louisiana appellate court properly invoked and applied the *Jackson* standard.  *See Banks*, 86 So. 3d at 64.  The court began by referencing the definition of second degree murder found in LA. REV. STAT. § 14:30.1(A)(1): "the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm."  *Id.*  The court then summarized the relevant testimony presented at trial:

Michael Johnson testified that on June 29, 2002, he saw and immediately reported smoke at the burning home.

Ronald Daley testified that:

• he was a Ouachita Parish fireman who responded to the emergency call;

• the fire department arrived four minutes after the call to find chest-high smoke coming from the house, indicating that the fire was just starting;

• an unresponsive female and male were found and removed from the home;

• both of the victims were dead;

• each body reflected massive blunt force trauma to the head;

• the female was burned from the head to just above the knees;

• the fire was small and concentrated in a side bedroom;

• a chair in the room appeared to be the focus point of the fire; and

• the fire was extinguished in less than a minute by 50–100 gallons of water.

Greg Thompson, a fire department investigator, testified that:

• he concluded that the fire was started in a bedroom by a person using an accelerant, gasoline;

• he was aware of no burns on the male victim; and

• the fire had burned for less than 30 minutes before fire personnel arrived.

Lt. Renee Smith testified that:

• at the time of the fire, she was a sergeant with the crime scene unit of the investigation division of the Ouachita Parish Sheriff's Office;

• both bodies had already been removed from the house when she arrived;

• Williams's body was charred from her head to just above her knees;

• the odor of gasoline was noted on Williams's body;

16

• there were no burn areas on Tugler's body;

• she identified photographs and video taken at the crime scene;

• technicians noted a broken lamp, directional blood splatter, blood splatter on the headboard, and transfer evidence of blood;

• more directional blood splatter was found in the kitchen;

• dishes were turned over and broken, suggesting a possible struggle;

• the hallway also reflected signs of a struggle, including black shoe marks on the wall and indentations where apparently the weapon used struck the wall;

• upon returning to the crime scene the next day, technicians found a 22–inch plumbing pipe on the water-pooled floor in the front bedroom;

• the pipe had not been seen the night before, when the house was very dark;

• hair was on one end of the pipe, a sample of which was taken to the crime lab;

• nothing at the crime scene could be traced back to Banks;

• the material on the end of the pipe was from a human;

• no DNA evidence was recovered from the pipe or the hairs;

• a metal T-ball bat and a wooden bat were also found inside the house, but there was no indication that they had been used in either murder;

• technicians recovered a butane lighter in a walkway outside the house;

• a blood-soaked pillow was found in the yard;

• investigators did not find Banks's fingerprints or palm prints at the scene;

• only a trailer separated Banks's house from the burned home;

• both homes had light poles out front;

• during a June 30, 2002, search of Banks's house, several items were seized;[7]

• no accelerant was found at Banks's house, nor was any odor of an accelerant detected on any of his clothing;

• neither the items seized from his home nor those seized from his motor vehicle connected Banks to the crime scene;

• given the indications of a struggle and the large amount of blood, she assumed that had Banks been there, he would have had quite a bit of blood on him; and

• blood evidence can be destroyed by fire, diluted by water, or destroyed by some chemicals, such as are found in laundry detergent, the use of which makes the recovery of blood evidence quite difficult.

Capt. Larry Knight testified that:

• in 2002, he was an investigator with the Ouachita Parish Sheriff's Office;

• the night of the crimes, he sent to all local agencies a BOLO for Banks's truck;

• Banks was located about 3:00 a.m. on June 30, 2002, at the residence of Beverly Connor on Outlet Road in Monroe;

• Banks voluntarily agreed to accompany the officers to the sheriff's office;

• he admitted that he and Williams had a violent relationship for 11 years, but they had become friends, though he hadn't seen her for two weeks;

• Banks said that Williams had previously accused him of certain crimes and that he pled guilty to kidnapping and to stabbing her, but those charges were false;

• Banks said that Williams was a drug addict with a crack cocaine problem;

• Banks was angry about her drug use, and had called the Sheriff's Department on the day of the fire, reporting that Williams was dealing drugs;

• Banks didn't like being broken up with Williams, who had a new boyfriend;

--------

[7] Among the seizures: a 24–inch iron gas pipe, taken from the gas heater in his bedroom, wood flooring, cabinet doors, floor tile, the back door, boots, and black leather loafers. Smith said that all possible bloodstains on these items were dried, making it difficult to determine when they were made. A washing machine, filled with wet clothes, was also taken.

18

• on the day of the murders, Banks said that he was at home and saw Ronnie Hands walking in the neighborhood, looking for his dad;

• Banks never went to Williams's house that day;

• Banks said he left his house around noon, went to get beer, and then went to his relative's house on Outlet Road, where he played dominos;

• Banks said he later drank more beer at the home of someone named Steve, whose address he could not remember;

• Banks said he returned to the Outlet Road home and got his hair braided;

• Banks said he stayed there until officers contacted him around 3:00 in the morning, at which time he knew nothing of the fire or the deaths;

• Banks asked if Williams had been killed with a pipe or a bat, which surprised the officers, who were at that time unaware of the pipe at the crime scene;

• Banks allowed the officers to search his home and property;

• officers retrieved Banks's phone records for the land line at his house;[8]

• he (Knight) took over the case about two days into the investigation and remained on the case throughout the year;

• none of the details were released to the public or to participating witnesses;

• no arrests were made but officers continued to investigate;

• after early 2003, there was no further activity in the investigation;

_____

[8] • On the morning of June 29, 2002, Banks called the Ouachita Parish Sheriff's Department six times: at 10:23, 10:50, 10:54, 10:56, 10:57, and 11:48;
• during the 10:57 call he left an anonymous message that drugs were being dealt at the victims' residence at 1606 Highway 139;
• at 10:48 and 10:50 a.m., Banks called the Monroe Police Department;
• at 10:52 a.m., Banks called Metro Narcotics;
• at 12:01 p.m., a phone call to the plumbing supply warehouse was made;
• at 4:30 p.m., a call was made to Beverly Connor's home on Outlet Road; and
• at 9:09 p.m., a call was made to a number belonging to Chasity Bradshaw at 10645 Parkwood Drive, Bastrop, Louisiana, where Zandria Lollie lived.

• he was transferred to patrol in 2004, ending his involvement in the case;

• Banks was very cooperative and neatly dressed during the interview, with no scratches, abrasions or bruises;

• Banks cried and was emotional during the interview;

• Williams's last boyfriend, Michael Jones, was questioned, but had an alibi;

• Jones was never really considered a suspect, and his house was not searched;

• Jones would have been physically unable to kill the victims;

• his agency had information that Williams tried to buy drugs on the day before her death, along with a friend named Pauline, who provided confirmation;

• he never found out the identity of the alleged supplier;

• he knew of no drugs or drug paraphernalia found at the crime scene; and

• no evidence was recovered linking Banks to the crime scene.

Frank Anzalone testified that:

• he owned a Monroe hardware store that sold plumbing supplies;

• he had known Banks for 20 years, as he was a frequent customer;

• he had referred customers to Banks for odd jobs;

• the pipe shown him at trial was sold from his store; and

• only his store and Ace Hardware carried that pipe brand in the Monroe area.

Eddie Barnes testified that:

• on the night of the fire, he was in the neighborhood, waxing his truck and listening to the radio, under a bright moon;

• there was a light right by Banks's house;

• he saw Banks arrive in his white pickup truck about 10:00 or 10:30 p.m.;

• Banks usually parked in back of his house, but this time he parked out front;

• his cousin also noted that Banks had come home;

• he (Barnes) saw Banks exit the truck and head toward Ruthie Williams's trailer, near the house of the victims, but he did not see Banks actually get to the house;

• after he finished waxing his truck, he and his nephews watched a movie at home; and

• later that night he heard the ambulance.

Michael Jones testified that:

• in 2002, he and Williams were dating, and he often stayed at her house;

• during the week before she was killed, Banks came over to her house and argued with her, calling her a bitch and a whore;

• he once saw Banks hiding in the woods, looking at him;

• he (Jones) and Williams had lived together in a house off Jackson Street, but Williams's aunt, Ruthie Williams, let her live in the house next to her trailer;

• she had been living there for about a month when the homicides occurred;

• on the date of the murders, Ruthie Williams took him home[9] to get his stuff;

• only he, Ruthie Williams, and Tugler had been present when he left;

• he was planning on moving in with Irma Williams; and

• he knew about her drug usage.

Zandria Lollie testified that:

• at the time of the murders, she lived in Bastrop with her parents and her fiancé, Antonio Connor, who is a cousin to the defendant;

• she and Antonio were in Monroe that weekend, staying with his mother;

---

[9] Jones had physical disabilities, necessitating his dependence on others for transportation.

• on June 29, 2002, Banks came over midmorning to play dominoes;

• her mom and stepdad picked her up so she could do her mother's hair;

• about 9:00 p.m., she was still at her mother's house when she received a phone call from Antonio, whose whereabouts were unknown to her;

• she hung up and went to Beverly Connor's house on Outlet Road, arriving about 9:40 p.m., at which time she did not see Banks;

• hours later, Banks burst inside, sweaty and wearing muddy clothes;

• he said that he had done something bad but did not say what;

• he grabbed some cleaning supplies and a towel and went back outside;

• he returned with his truck seat covers, which he put into separate bags;

• she was helping Beverly Connor pack away old clothes when Banks returned;

• he changed into some of the clothes and bagged the garments he was wearing;

• Banks asked her to braid his hair, which was sweaty and wet;

• he had never asked her to braid his hair before;

• while she was braiding his hair, Banks turned on a police scanner;

• she heard the police describing a truck like his, but when they read the license plate number, he sighed and said, "That ain't my truck";

• she heard the police talking about coming for Banks;

• he asked that she keep the seat covers at her mother's house and she said no;

• she did not know what Banks did with the seat covers after that; and

• right before the police arrived, he got on the couch and faked being asleep.

Antonio M. Connor testified that:

• on June 29, 2002, he was living with his girlfriend, Zandria Lollie, and her mother and stepdad in Bastrop, Louisiana;

• that day he and Banks were drinking and playing dominoes at his mother's house when they left to go to Steve's house, where they drank more;

• that evening, they left Steve's house, stopped at the store and then went to Banks's house, where he (Connor) called Lollie in Bastrop;

• he and Banks returned to Beverly Connor's Outlet Road home; and

• he never saw Banks again that day.

Kenneth Jones testified that:

• he was married to Charlotte Jones, who was the aunt of the victims;

• Williams and Tugler would often stay with them;

• Williams was a nice person who did not cause trouble;

• Tugler did not bother people, but he would defend himself, if needed;

• Tugler was very protective of his family, including Williams;

• he knew that Banks and Williams previously had a "raggedy" relationship;

• Banks and Williams often argued, and two weeks before Williams died, he came home to find Banks pinning Williams and choking her;

• he went inside to get a gun, but came out unarmed, as Banks was leaving;

• Tugler walked up and spoke to his sister; and

• Banks yelled as he left that he was going to get all of them.

Charlotte Jones testified that:

• her niece was a sweet, loving, and kind person;

• Tugler was a loving and kind person, who was very protective of his family;

• she had known Banks for a long time, and he was very controlling;

• Williams and Banks had a rocky relationship and would argue all the time;

23

• Banks tried to keep Williams isolated from her and her husband; and

• she also saw Banks choking Williams two weeks before her death.

Capt. Jay Ellerman, testified that:

• on April 13, 1998, he was a corporal in the Ouachita Parish Sheriff's Office;

• on that date, he answered a domestic disturbance complaint made by Williams, who alleged that Banks had stabbed her twice on her thigh;

• she had scratches on and behind her ear, and facial swelling;

• he arrested Banks for aggravated battery and aggravated kidnaping; and

• Banks was prosecuted for aggravated battery and false imprisonment, and was placed on supervised probation for five years.

Tenisa Lyles, daughter of Irma Williams, testified that:

• her mother was a good person, sweet and nice, and not a fighter;

• Williams was a good mother, who took care of Lyles and her siblings;

• she knew her mother had a drug problem;

• Tugler, her uncle, treated her like he was her father and was a gentleman;

• her mother dated Banks for about 10 years, during which time they lived off-and-on with him, their relationship being "horrible";

• she did not know why Williams stayed with Banks, who would beat her and isolate her from her children, sometimes making her live in a tent;

• Banks said that if he could not have Williams then no one could; and

• she last saw her mother on Friday, June 28, 2002.

Deputy Larry Ludlow testified that:

• in June of 2009, he was an investigator with the Ouachita Sheriff's Department;

• he learned that an inmate named Mario Greely had information on the murders;

24

• he had dealt with Greely before during his time with the Sheriff's Department;

• Greely told him that on June 29, 2002, he was across the street from Williams's house and saw Banks walking away from there about the time of the murders;

• the facts Greely gave him were consistent with what he knew about the case;

• he (Ludlow) lived not far from the area where Williams, Banks, and Greely lived in 2002, and people often hung out in that neighborhood; and

• he felt Greely's statement provided probable cause to arrest Banks.

Gene Benoit, a former sheriff's deputy, testified that:

• he owned a car wash and storage facility, and Williams had been a customer for about 10 years, and had rented storage space on two or three occasions;

• each time, Williams had serious arm and leg injuries and she told him that she had been beaten by Banks and she was trying to get out of the situation; and

• he had known Banks for about 30 years.

Mario Greely testified that:

• he lived on Burkes School Road, off of Hwy. 139;

• he had known Tugler for about five years and knew of Williams;

• he had known Banks all of his life, about 36 years;

• he lived across the highway from Banks, about 100 yards away;

• he did not know that Williams and Tugler were sharing a house in 2002, but he knew that Tugler lived two houses down from Banks;

• in 2002, people would hang out and drink every day around a tractor tire about 100 yards directly across the street from where Williams and Tugler lived;

• nothing blocked the view from that tractor tire to the house;

• on the day of the murders, he had been hanging out at the tractor tire when Williams and Tugler joined him during the early part of the afternoon;

25

• Banks asked Williams to go across the street with him, but she refused;

• in the early evening, he heard Williams and Banks arguing in her house;

• he later looked up and saw Banks walking along the fence line that runs along the back of the properties, heading toward his house;

• Banks was not wearing a shirt when he saw him;

• Greely continued to sit and drink for a while until he went home about 9:00 p.m., about 90 minutes before the fire trucks began arriving;

• when Ludlow interviewed him in June of 2009, he was in jail;[10]

• he (Greely) took Tugler to buy crack cocaine, without Williams;

• no one else was in the area where he was sitting at the time he saw Banks;

• at that point he had been drinking, but he was not intoxicated; and

• he heard no yelling or screaming that night, nor did he hear Banks make any threats to Williams earlier that day at the tractor tire.

Dr. George McCormick, who conducted the 2002 autopsies, was deceased at the time of trial.

Dr. Frank Peretti was accepted by the court as an expert in the field of forensic pathology, and he studied Dr. McCormick's autopsy report. He testified that:

• the bodies were exhumed on January 28, 2011;

• he conducted a second autopsy of both victims on January 29;

• on review of photographs taken in 2002 of Tugler's body, Peretti noted blunt force trauma to the head with multiple lacerations and massive multiple fractures of the skull, with skull bones being imbedded in the brain;

• the blunt force injury led to three types of hemorrhage;

• there were four or five impact sites on Tugler's skull with massive crushing injuries, blows which would have rendered Tugler immediately unconscious;

---

[10] He was incarcerated for possession of marijuana, a charge later dropped.

• he concurred with McCormick's assessment that the cause of Tugler's death was multiple blunt force head injuries;

• Williams had post-mortem thermal burns and multiple impact sites;

• autopsy photos indicated a pattern of injuries consistent with a valve on a pipe;

• he concurred with McCormick's finding of 23 lacerations on Williams's body;

• Williams's cause of death was blunt force head trauma; and

• at death, both victims had cocaine in their system.

Linda Armstrong, director of the North Louisiana Crime Lab, was accepted as an expert in the field of DNA analysis. She testified that:

• an organic stain does not always translate into a DNA analysis;

• an accelerant similar to gasoline was on Williams's hair and clothing;

• the hairs from the iron pipe had no root material, preventing DNA analysis;

• the pipe was swabbed for suspected blood and a cluster of hair and fuzz was collected from the pipe, all of which lacked DNA material;

• the only DNA found at the scene was that of the two victims;

• if the pipe had sat submerged in water, there would be no remaining blood or DNA cells left by skin shed on contact with the pipe;

• Banks's truck was thoroughly searched by the crime lab;

• even though Banks had driven the truck for many years, absolutely no DNA was recovered from the vehicle, not even his own;

• seat covers would normally reveal the most DNA material;

• scrubbing the seats with detergent would destroy any DNA present; and

• none of the physical evidence analyzed connected Banks to the crime scene.

*Banks*, 86 So. 3d at 57-64 (footnotes in original).

27

Applying the *Jackson* standard, the appellate court held that "any rational trier of fact could have found that all elements of these second degree murders were proven beyond a reasonable doubt." *Id.* at 66.  The court reasoned:

The **total absence** of any DNA material in his truck, however, suggests that he sanitized the vehicle. Fire and water destroyed the perpetrator's DNA at the murder scene. Banks changed clothes and discarded the garments he had worn that night. His own words admitted doing something wrong. More circumstantial evidence is reflected by Banks's conduct just after the killings, including cleaning his truck late at night, changing clothes, asking someone to keep the seat covers in Bastrop, disposing of his clothes and his seat covers, and pretending to be asleep when the police arrived. He lied about his location that evening, according to the cell phone evidence. He was a violent man, and he had harmed Williams before.

Testimony by Greely and Jones contradicted Banks's statement about not having seen Williams for two weeks prior to her death. The afternoon before her death, Jones saw and heard Banks arguing with her. Greely saw him talking to her at the tractor tire that afternoon, and heard them talking at her home that evening.

Banks's actions suggest that after 10 years of violence, he was not going to leave her alone even though they had broken up and she was dating someone else.

The jury weighed the credibility of all witnesses. The verdict suggests the state's witnesses were credible. Such determinations of weight and credibility by the fact finder are given great deference and are not reassessed on review.

The jury could have reasonably found that Banks killed Williams and Tugler. As he was a plumber, he obviously had on hand, or could easily obtain, the likely murder weapon, a plumbing pipe with a valve on one end. He had a history of violence regarding Williams, and he had recently choked her. In the days before the killings, he had threatened the victims. He was intent upon continuing the violent relationship, even though she had a new boyfriend. He admitted being angry with Williams, and he placed nine phone calls that day to turn her in for drug dealing. In a depraved story as old as time, he did not want another man to have her.

Banks had the opportunity, the means, the physical ability and the emotional outrage necessary to kill both victims. His specific intent to kill[11] is evidenced by the massive

---

[11] The intent required to prove second degree murder could be the lesser standard of specific intent to inflict great bodily harm.

blunt force trauma to both victims. He burned her, then went to great lengths to cover up his crimes—and he got away with it for seven years.

That evening, Banks frantically told Lollie that he had done something wrong. He then set about to destroy evidence by removing all DNA from his vehicle, by disposing of his clothes and car seat covers, and by lying to law officers about where he had been that day and when he had last seen Williams. His monitoring of the police scanner and feigned sleep also speak volumes. His own words and actions proved beyond a reasonable doubt that he committed these atrocities.

*Id.* at 65-66.

Here, a review of the state court record shows that the appellate court's application of *Jackson* was not objectively unreasonable.  This claim should be **DENIED**.

### Conclusion

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of *habeas corpus* filed by Petitioner Matt Banks, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 5th day of January, 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE